**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

JASON SPERLING, M.D.,

               Plaintiff,

   -against-

NUVANCE HEALTH MEDICAL PRACTICE, P.C.,

         Defendant.

Case No: 23 Civ. 9434

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

     Plaintiff, Jason Sperling, M.D.  ("Dr. Sperling"), by and through his attorneys, Mandel Bhandari LLP, as and for his Complaint against Nuvance Health Medical Practice, P.C. f/k/a Health Quest Medical Practice, P.C. ("Nuvance" or "Defendants"), respectfully alleges as follows:

### NATURE OF THE CLAIMS

    1.    This is a case about a hospital who put profits and physician egos above patient safety and a doctor who was punished for speaking against it.

    2.    Dr. Sperling is a highly regarded heart surgeon with more than 19 years of experience in thoracic and cardiovascular surgery.  He was hired as the Chief of Cardiovascular Surgery with Nuvance (then Health Quest Medical Practice) beginning in January 2018.  Dr. Sperling and the surgeons and practitioners under his supervision formed a highly skilled and award winning team tasked with increasing the range of cardiac surgeries and performing difficult and risky procedures for patients who required life-altering or life-saving intervention.

    3.    While at Nuvance, Dr. Sperling discovered serious problems with Nuvance's handling of certain complex cardiac procedures.  In particular, he repeatedly complained to his supervisor, Dr. Mark Warshofsky ("Dr. Warshofsky"), about two procedures, "ECMO" and "TAVR", which were repeatedly performed in a manner that increased patient risk.

4.       With respect to TAVR, Nuvance violated Medicare guidelines by permitting the procedure to be done by two interventional cardiologists even though the active participation of a cardiac surgeon is required.  Nuvance then billed Medicare as though the cardiac surgeon had jointly participated in the intra-operative technical aspects of the procedures.  By performing these procedures in this manner, Nuvance ensured that it would receive full Medicare reimbursement (~$60,000 per procedure) but ignored Medicare's billing requirements, potentially placing patients at risk.

5.       With respect to ECMO (an emergency salvage procedure similar to a heart-lung machine), certain Nuvance cardiologists encountered repetitive serious bleeding complications associated with their catheterizations. They also attempted to bully the surgeons regarding both initiation and ongoing management of ECMO, despite the surgical team's clear advantage of significant experience.

6.       When Dr. Warshofsky ignored Dr. Sperling's complaints, Dr. Sperling went to other, more senior, hospital and system group doctors and administrators, ultimately including Nuvance's Chief Executive Officer.  As a result, Nuvance retaliated against Dr. Sperling, first ensuring his surgery group was understaffed, then telling Dr. Sperling he would be replaced as the Chief of Cardiovascular Surgery.

7.       In early October 2022, weary of Dr. Sperling's warnings about patient safety, Dr. Warshofsky put Dr. Sperling on a paid "administrative leave" for the remainder of Dr. Sperling's contract (through mid-July 2023).  This further retaliatory action violated the express language of that agreement, which stated that Dr. Sperling could not be removed absent risk to the "health and safety" of patients or staff.  No such risks were ever identified.  Indeed, Nuvance permitted Dr. Sperling to continue to treat patients for several days after informing him about the forced leave.

8.     Nuvance's multiple retaliatory acts tarnished Dr. Sperling's name and reputation. As a result, Dr. Sperling was unable to secure a comparable position after his ouster.  Ultimately, he was forced to accept a job in the Midwest as a staff heart surgeon, a substantial demotion with significantly lower compensation.

9.     In Nuvance's final act of retaliation, it simply refused to pay Dr. Sperling contractual payments due of ~$77,000, breaching not only Dr. Sperling's contract, but also violating New York Labor Law ("NYLL") wage payment statutes.

## THE PARTIES, JURISDICTION, AND VENUE

10.     Plaintiff Jason Sperling is an individual residing in Upper Saddle River, New Jersey and a citizen of New Jersey.

11.     Defendant Nuvance Health Medical Practice, P.C. is a not-for-profit corporation doing business at Vassar Brothers Medical Center at 45 Reade Place, Poughkeepsie, NY 12601.

12.     Nuvance (formerly HealthQuest) employed Dr. Sperling from in or around February 2018 until July 2023.

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because Dr. Sperling, on the one hand, and Nuvance, on the other hand, are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14.     Venue is proper pursuant to 28 U.S.C. § 1391, since, among other things, Dr. Sperling was employed by Nuvance in Dutchess County, New York, Defendants do business in this district in Dutchess County, New York, and the claims and causes of action arose in this district in Dutchess County, New York.

## STATEMENT OF FACTS

**A.     Background**

15.     Dr. Sperling is an extremely experienced cardiac surgeon.

16.     Dr. Sperling is a 1995 graduate of SUNY Downstate Medical Center, where he was elected to the Alpha Omega Alpha national honor society and served as its chapter President.  He did his residency in General Surgery at the University of Maryland, a research fellowship at Harvard's Children's Hospital and a fellowship in Thoracic and Cardiovascular Surgery at the University of Virginia.

17.     Before joining Vassar, Dr. Sperling was the Director of Cardiac Surgery and the Medical Director of Cardiovascular Services at HCA/HealthONE in Denver (2014-2018); the Subspecialty Director of Valley Hospital's Thoracic Aneurysm and Bicuspid Aortic Valve Program and its Surgical Atrial Fibrillation Program in Ridgewood, New Jersey (2009-2014); and a Cardiothoracic Surgeon at Valley Hospital (2004-2014).

18.     For ten years (2004-2014), Dr. Sperling was an Assistant Clinical Professor of Surgery at Columbia University-Presbyterian Hospital.  Dr. Sperling has been the principal investigator on multiple cardiology research studies, including one involving aortic valve issues. Dr. Sperling also serves on the Society of Thoracic Surgeons' Aortic Task Force.

**B.     Employment at Vassar**

19.     In 2017, Dr. Sperling decided to return to the New York area for family reasons and accepted a role as Chief of Cardiovascular Surgery for HealthQuest at Vassar Brothers Medical Center ("Vassar") in Poughkeepsie, New York.

20.     On August 28, 2017, HealthQuest and Dr. Sperling entered into a contract (the "Employment Agreement").

21.     In addition to his salary, the Employment Agreement guaranteed Dr. Sperling a set of non-discretionary incentive payments based upon (A) his achieving certain clinical measures; (B) his performance of certain call coverage; and (C) his achieving certain administrative efficiency measures.

22.     Pursuant to the Employment Agreement, Dr. Sperling could not be terminated except for cause for five years.  After that point, Dr. Sperling could only be terminated without cause with at least 180 days written notice.

23.     Because of the potential risks to his professional reputation, the Employment Agreement also protected Dr. Sperling against unwarranted suspensions, even with pay.  Pursuant to the Employment Agreement, Dr. Sperling could only be suspended where his "continued activity puts at risk the health and safety of any patients, fellow employees, or [himself]."

24.     Dr. Sperling commenced working as Chief of Cardiothoracic Surgery at Vassar on or around January 15, 2018.

25.     In 2019, Nuvance Health was created out of a merger between Western Connecticut Health Network and HealthQuest.

26.     Following the merger, Nuvance became the successor to Dr. Sperling's Employment Agreement.

**C.      Dr. Sperling Discovers Problems With Patient Care**

27.     Dr. Sperling began reporting to Dr. Mark Warshofsky in 2020 after the merger and the formation of a Nuvance system-wide Heart and Vascular Institute.

28.     Dr. Warshofsky is an Interventional Cardiologist.  In assuming the role as Chair of the Heart and Vascular Institute at Nuvance, he managed over 50 cardiologists at several locations in New York and Connecticut, plus Dr. Sperling's Cardiac Surgery team at Vassar, which was

comprised of another surgeon, advanced practice practitioners, as well as occasional "locum" surgeons (independent contractors).

29.     By mid-to-late 2020, Dr. Sperling became concerned about the handling of two types of medical procedures at Vassar, TAVR and ECMO.  As discussed in detail below, he repeatedly brought his concerns to Dr. Warshofsky's attention, only to be punished for doing so.

**TAVR**

30.     Trans-catheter aortic valve replacement ("TAVR")[1] is a life-saving heart procedure used in the treatment of aortic stenosis, a common and potentially serious valvular heart disease that affects heart function by partially obstructing the blood flow from the heart to the aorta.

31.     In performing a TAVR, two proceduralists (an interventional cardiologist and a cardiothoracic surgeon) make a small opening in the femoral artery near the groin (most commonly), or another alternative point of entry, and insert a catheter carrying a bio-prosthetic expanding valve. The replacement valve is guided through the chosen artery to the damaged heart valve, where it is deployed.

32.     Medicare coverage of TAVR dates back to 2012. At the time, The Centers for Medicare and Medicaid Services ("CMS") viewed TAVR as experimental and potentially quite risky.  To protect patient safety, CMS conditioned TAVR reimbursement on the full and thorough participation of appropriate specialists in caring for TAVR patients. With input from the major cardiology and cardiac surgery specialty societies, CMS therefore directed that hospitals form

---

[1]     *See e.g.*, https://www.nhlbi.nih.gov/health/tavr

multidisciplinary heart teams led by a cardiac surgeon and an interventional cardiologist working together and actively involved in all aspects of care.[2]

33.    Nuvance did not adhere to this requirement.  Instead, Nuvance permitted all technical aspects of TAVR to be performed by two interventional cardiologists, with no input or participation by a cardiac surgeon, which was not compliant with CMS billing regulations.

34.    This risky behavior had serious consequences for patient care.  Of all of the hospitals ranked in New York by the Department of Health concerning the results of TAVR procedures, Vassar finished dead last for 2016-2019, with a risk-adjusted mortality rate that was noted to be significantly higher than expected.

35.    Further, based on Dr. Sperling voicing objections regarding surgeon participation as early as 2018-2019, an outside expert review of Vassar's TAVR program in or around 2019 cited the dangers of marginalizing the surgeons in this TAVR program because it could lead to unsafe situations and poor collaboration.

36.    The problems with TAVR grew worse over time.  The interventional cardiologists had already usurped many of the important technical aspects of TAVR by the time of Dr. Sperling's arrival in 2018.  But in or around early 2021, Dr. Sperling learned from one of the surgeons in his group that while he (the surgeon) was present during the procedures, he was not participating in the intra-operative technical aspects of TAVR *at all*, instead essentially sitting in the corner while cardiologists filled the entire role that Medicare required the surgeon to fill.

---

[2]    *See* https://www.cms.gov/medicare-coverage-database/view/ncd.aspx?NCDId=355, providing "The heart team's interventional cardiologist(s) and cardiac surgeon(s) must jointly participate in the intra-operative technical aspects of TAVR."

37.     Worse, the surgeon who reported this behavior was assigned to nearly 90% of the TAVR procedures for joint participation at Vassar. This practice placed patient health and safety at risk and was consistently reflected in the program's outcomes.   A locums (covering) cardiovascular surgeon also confirmed this practice to Dr. Sperling and complained to both Dr. Sperling and the administration. A second locums surgeon relayed the same experience and that she "might as well have not even been there."

38.     Nuvance's fraudulent billing of Medicare for unsafe and non-compliant TAVR procedures is currently the subject of an unsealed False Claims Act action currently pending in the Northern District of New York, captioned *United States of America* ex rel. *Alon Aharon et al. v. Nuvance Health, Inc., et al.*, Case No. 22 Civ. 47 (DNH) (ML) (N.D.N.Y).  Dr. Sperling is one of multiple former Nuvance physicians serving as relator plaintiffs in that action.

*ECMO*

39.     Extracorporeal    membrane    oxygenation    ("ECMO")[3]    is    an    advanced cardiopulmonary mechanical support strategy that uses a version of a heart-lung machine.   In essence, it allows an external machine to pump and oxygenate a patient's blood when the patient's heart and/or lungs are damaged.

40.     While use of ECMO can be life-saving, it is a risky procedure.  To manage that risk, ECMO requires (with rare exception) the participation of a cardiac surgeon. While it may be initiated and co-managed along with cardiologists in certain settings, the involvement of cardiac surgeons is best practice due to the multi-disciplinary nature of these patient issues.  Notably, when the ECMO procedure is initiated in surgery, cardiologists are not typically involved.

---

[3]     *See, e.g.,* https://www.mayoclinic.org/tests-procedures/ecmo/about/pac-20484615

41. Dr. Sperling had substantial active ECMO experience prior to joining Nuvance. Heart surgeons often become familiar with ECMO because it is similar to heart-lung machines, which are commonly used during heart surgeries. Upon joining Vassar, Dr. Sperling introduced ECMO to the great enthusiasm of the cardiologists, who had limited exposure to, and virtually no recent experience with ECMO.

42. A few of the cardiologists, however, quickly began relying upon ECMO initiation to rescue treatment failures and possibly avoid mortalities that could be associated with their care.

43. On numerous occasions, these cardiologists would summon the on duty cardiothoracic surgeon to the cardiac catheterization lab ("cath lab") or intensive care unit and demand that a patient – often in full cardiac arrest and/or often already unsalvageable – be placed on ECMO in a hurried manner. Many of these patients had sustained important vascular injuries during the cardiologists' attempts to salvage the situation before ECMO was requested, only for these vascular injuries to blossom into major fatal bleeds in the ensuing hours or days.

44. In addition, in multiple instances the cardiologists blamed the surgeon for their own complications and even documented these malicious allegations in the medical record in order to recuse themselves from blame and protect their own reputations.

45. Further, in the instances where the patients were successfully migrated to ECMO, the cardiologists "co-managing" patients with the surgery team often strongly pushed and insisted on actions that the surgical team believed would significantly and unnecessarily increase the rate of fatalities (especially premature cessation of ECMO).

46. When Dr. Sperling or the other surgeons resisted the cardiologists' "recommendations" – generally either to initiate ECMO or remove a patient from ECMO – they

were vilified in the post-hoc meetings as being non-collaborative or causing the death of the patients they were trying to rescue.

47.     This mismanagement of ECMO had disastrous results.  At Vassar, with ECMO initiated in the OR after heart surgery, there was a high rate of success.  In contrast, the initiation of ECMO in the cath lab had a ***near 100% mortality rate***.

**D.     Dr. Sperling Complains About Nuvance's Handling of ECMO and TAVR**

48.     On multiple occasions Dr. Sperling disclosed, complained of and objected to the manner in which TAVR procedures were performed at Vassar.

49.     On multiple occasions Dr. Sperling disclosed, complained of and objected to the manner in which ECMO patient management was performed at Vassar.

50.     Beginning in around mid-to-late 2020, Dr. Sperling related these complaints to his manager, Dr. Warshofsky.

51.     Dr. Sperling was not alone in this judgment.  One of the staff cardiac surgeons and at least one of the locum surgeons encouraged Dr. Sperling's resistance to the manner in which these procedures were performed at Vassar.

52.     Despite this, Dr. Warshofsky, himself an interventional cardiologist and not a surgeon, was unwavering in his support of the manner in which these procedures were managed at Vassar.  Dr. Warshofsky rejected any attempts to address Dr. Sperling's reasonable requests to manage these procedures in a way that would comply with federal law and improve patient results.

53.     Due to Dr. Sperling's complaints to Dr. Warshofsky, on January 28, 2021, a meeting was held among a multi-disciplinary group to address the ECMO complications and create a safer plan moving forward.

54.     Rather than address the issues that were resulting in a near 100% mortality rate when ECMO was initiated in cath lab, the meeting was used as an opportunity for the cardiologists to vilify the surgeons and blame them for technical complications resulting from the cardiologists' own actions.

55.     During the meeting, and in discussing a specific case, several cardiologists accused one of the cardiac surgeons (not Dr. Sperling) of directly causing death related to ECMO initiation. These cardiologists wrote the same in the medical records to deflect blame from themselves to the cardiac surgeon.

56.     During this meeting, Dr. Warshofsky allowed these cardiologists to blame the surgeons for the poor outcomes in ECMO procedures initiated in the cath lab.

57.     In the specific instance, a few of the cardiologists ganged up on and blamed a cardiac surgeon in Dr. Sperling's group for recklessly "pulling out ECMO cannulas (IV access)" when he did not (the cardiologists were responsible), and for causing ECMO patients to die because the surgeons would not follow their directions.

58.     After getting feedback from multiple people on the call (surgeons, Quality and Risk professionals), Dr. Sperling communicated directly with Dr. Warshofsky about the meeting. He emphasized that progress had not been made and that patient safety was at risk. In an email to Dr. Warshofsky on January 29, 2021, Dr. Sperling wrote:

> I am very disappointed by what transpired yesterday. This was supposed to be a QI about 3 consecutive cardiology (medical) ECMO deaths, and how the team can get better at avoiding this. Instead, this was a public lynching of Dr. [redacted] and the cardiologists recusing themselves of any responsibility for these deaths, when they have at best, shared responsibility, but the reality is that they are primarily responsible. The hostility of [names redacted] was obvious. Our chief perfusionist confided to me after the call that he wanted to say some things but felt intimidated by the environment. The two young vascular surgeons on the call saw me this morning and mentioned how brutal they thought it was, and not at all in the spirit of quality improvement. [name redacted] called me and was

11

disgusted as well. And I don't think you were able to get reasonable control of the room and discussion (if we can even call it that).

For the record, in terms of quality improvement – I tried to communicate these points, but I think the cardiologists were focused on the blame game:

COVID-ECMO case: that should not have been initiated in the ICU; multiple people involved told me she was stable for transport; I suspect she developed an AV fistula in the left groin. On the second two cases – after speaking with [name redacted], what happened is clear to me: on both cases, the arterial cannula sutures were all removed, and nobody controlled them manually and they slowly pushed back and self-decannulated. It will happen every time. This had nothing to do with the venous cannula (and it was interesting getting a lesson about how my own cannula works from a cardiologist). These arterial cannula sutures were cut by the interventionalist in order to attempt percutaneous SFA cannulation both times, which apparently was challenging and time-consuming on both cases. This represents a misunderstanding of the physics of groin cannulation for ECMO, and a degree of inexperience. If they need to temporarily displace the cannula for SFA cannulation, at least one suture has to stay in (and displace the tubing medially or laterally) or someone (can be a tech) has to hold it until it can be re-secured.

Regarding [name redacted] leaving the room – I spoke with him, and this was corroborated by the perfusionist: the patient was on ECMO with good flows for around an hour, and he stepped out of the room to take a phone call. He was in the cath lab front office, and came right back in the room when called. To suggest he abandoned the patient is beyond offensive, and frankly, a very tough situation to rescue. When I asked him why he didn't say anything to defend himself, he said that it was so hostile, he was afraid to speak up, and you never asked him directly.

Honestly, I don't think CV surgery should be required to participate in meetings like this. Everyone needs to be more respectful and grateful for each other's support and expertise. To blame the surgeon for these events and to suggest that the heart surgeon's job on ECMO cases is to stand near the groin and hold the cannulas is beyond offensive. We need cardiac surgery, but not necessarily interventional cardiology, for ECMO. As a program, I think we would do better to give the cardiologists a tool they can use in an emergency, like TandemHeart, and any cases that need to be referred for escalation to ECMO should be taken care of completely by the surgeons, in the hybrid OR. And ideally, we would decide when a patient is ready for decannulation, with constructive input from the non-invasive cardiologist. I'm sure we will have plenty to discuss later, thanks for listening.

59.     Instead of considering and addressing Dr. Sperling's concerns, Dr. Warshofsky ignored and defended the cardiologists, writing:

> Thanks for your input.  I actually disagree with the characterization.  While I understand people have different perspectives, multiple people commented (noncardiologists) that they thought it was a fair discussion.  I think initially, the response of [name redacted] which was essentially- not my problem I didn't do anything wrong, elicited a strong counter response.  I also heard cardiologists taking ownership of some aspects of the cases and outcomes.  I spoke to [name redacted] who was only there for the second half of the meeting.  Bottom line, we need true leadership on all sides.  I anticipate your continued assistance in improving the culture as well as holding team members to expectations of behavior and performance.

60.     This was not the first time that Warshofsky had downplayed or dismissed Dr. Sperling's concerns about patient safety.  Worried, Dr. Sperling sent the email string to Dr. Warshofsky's manager, Nuvance's then interim Chief Medical officer, Dr. Jeffrey Nicastro, writing "I think this represents the main problem here – [Dr. Warshofsky] has an obvious professional bias/handicap that he does not recognize," and "I think it's time you and I have a meaningful discussion about the future, before the CV surgical program gets irreparably damaged."

61.     Shortly thereafter, Dr. Sperling met with Dr. Nicastro, and with Dr. William Begg, Chief Medical Officer at Vassar, and Peter Kelly, Vassar's CEO.  Dr. Sperling told Drs. Nicastro and Begg, and Mr. Kelly of the concerns related to the management of ECMO, particularly those ECMOs initiated in the cath lab, and that the procedures were being mismanaged.  Dr. Sperling also expressed his concerns regarding improper TAVR billing and that Dr. Warshofsky's failing to manage the ECMO process caused avoidable deaths.  He made clear that if the process was not changed, the near 100% mortality rate would continue.

### E.      Nuvance Retaliates Against Dr. Sperling

62.      Dr. Warshofsky was incensed to learn about Dr. Sperling's meeting with Dr. Nicastro, Dr. Begg, and Mr. Kelly.

63.      Dr. Warshofsky met with Dr. Sperling and told him that these persons were not interested in his concerns and to cease approaching them.

64.      Shortly after this meeting, Dr. Warshofsky told Dr. Sperling that he would not be hiring a surgeon that Dr. Sperling had been recruiting for several months.

65.      The role of a third full-time cardiovascular surgeon had been vacant since 2020 and Vassar desperately needed the third surgeon.  Under normal circumstances, Dr. Sperling would have been given the autonomy to fill the role.  The prospective candidate had interviewed with both Dr. Sperling's team and key cardiologists, and was qualified for the surgeon role at Vassar that needed to be filled.

66.      However, in retaliation for complaining to his superiors, Dr. Warshofsky rejected the hire, again placing patient health and safety on the back-burner.

67.      At the same time, Dr. Warshofsky, in further attempted retaliation, instructed Dr. Sperling that he would be expected to facilitate clinical privileges at Vassar to the chief surgeon recently hired at Danbury Hospital (another Nuvance hospital), Dr. Richard Kaplon, presumably to marginalize Dr. Sperling.

### F.      Dr. Sperling Continues to Advocate for Patient Safety

68.      The patient mortalities related to ECMO procedures initiated in the cath lab continued.  Another surgeon, a very skilled locum surgeon who was chief of mechanical support and transplantation previously at an academic center in the Midwest, ceased covering Vassar, due to both the improper ECMO and TAVR environments.

14

69.     In explaining his decision, the surgeon told Dr. Sperling that with respect to ECMO, certain of the cardiologists made suggestions – that they insisted upon – that were dangerous and reflected a very limited knowledge of ECMO management.

70.     Another covering surgeon told Dr. Sperling that these cardiologists were "dangerous" to work with. She also stopped covering Vassar.

71.     In the summer of 2021, there were multiple serious vascular complications and issues with management of ECMO patients.

72.     As a result, Dr. Sperling recommended to Dr. Warshofsky that Nuvance temporarily stop ECMO initiations in the cath lab until they could create a plan that provided for greater patient safety.

73.     Dr. Warshofsky rejected the idea, and again continued to allow the cardiologists to push the surgeons into decisions that could adversely affect patient outcomes.

74.     In response to Dr. Sperling's request to suspend ECMO initiations in the cath lab, Dr. Warshofsky held a virtual meeting in or around September 2021.

75.     Dr. Warshofsky invited cardiologists and vascular surgeons, including Dr. Kaplon, the Danbury surgeon, but inexplicably excluded Dr. Sperling's cardiac surgery partner, who was heavily involved in many of the cases.

76.     The purpose of the meeting was obvious:  to reinforce the cardiologists' role in initiating and removing patients from ECMO, and to leverage Dr. Kaplon to support the agenda.

77.     As Dr. Sperling had feared, Dr. Warshofsky again used the meeting as a forum for the cardiologists to vilify and blame mortalities on the surgeons.

78.     There was no acceptance of taking a break from ECMO to identify and utilize better practices to avoid serious vascular complications prior to ECMO initiations, or allowing the much

more experienced surgeons to decide: (1) who gets ECMO in the first instance, and (2) who primarily manages complicated ECMO patients and makes the important decisions.

79.     The criticisms of how TAVRs were performed were not addressed.  Following the meeting, Dr. Sperling's surgical partner continued to report no involvement in the technical aspects of the procedures despite his presence in the cath lab and willingness to participate in his required role.

80.     Since no progress was being made with Dr. Warshofsky, in September 2021, Dr. Sperling met with Tracy Melina, Head of Risk Management for Vassar, to discuss his concerns.

81.     Dr. Sperling had a similar meeting in October with Kerry Eaton, then the interim COO of Nuvance.

82.     Dr. Sperling told Ms. Eaton that the structure of surgeons reporting to Dr. Warshofsky was not working because Dr. Warshofsky was failing to maintain a safe or compliant environment.

83.     Ms. Eaton arranged for Dr. Sperling to meet with Dr. John Murphy, Nuvance's CEO, which he did on November 2, 2021.

84.     But Ms. Eaton did nothing to keep the meeting confidential or to protect Dr. Sperling from retaliation for voicing his concerns to Dr. Warshofsky's superiors.  To the contrary, she specifically told Dr. Warshofsky that she had arranged for Dr. Sperling to meet with Dr. Murphy.

85.     During the November 2nd meeting, Dr. Sperling explained to Dr. Murphy his concerns related to the ECMO and TAVR procedures and patient safety and Medicare compliance. Dr. Murphy listened but did nothing about it.

**G.      Nuvance Continues to Retaliate Against Dr. Sperling for his Complaints**

86.      The meeting did, however, have immediate consequences.  On the very same day that he met Dr. Murphy, Dr. Sperling met with Dr. Warshofsky, who was joined by Kelli Stock, Vice President of the Nuvance Health Heart and Vascular Institute, and Eileen Miller of Human Resources.

87.      Dr. Warshofsky told Dr. Sperling that Nuvance was beginning to search for a new Chief of Cardiac Surgery at Vassar and that he was to be out of his role.

88.      Dr. Sperling told Dr. Warshofsky that this decision to replace him violated his employment contract, and asked Dr. Warshofsky for the basis for this decision.

89.      In response, Dr. Warshofsky made two allegations, both false.

90.      First, Dr. Warshofsky asserted that the cardiologists lost confidence in Dr. Sperling and were sending a lot of cases out of the system.

91.      This was untrue.  While every program took a volume dip after COVID-19, Dr. Sperling did almost the same amount of heart surgeries in 2022 (amortized for nine months of work) that he did during his busiest year of 2019.  Even the head of the cardiac catheterization lab at Vassar and most outspoken of the cardiologists, told Dr. Sperling that he was still sending Dr. Sperling all of his cases.

92.      Second, Dr. Warshofsky claimed that Dr. Sperling's cardiac operating room was a "hostile environment" where the staff were afraid to speak up about concerns.

93.      This too was untrue.  While heart surgeries can be emotionally intense, no one had previously claimed a "hostile environment," and no complaints were brought to either Dr. Sperling or to Human Resources.

94.    As a further humiliation, Dr. Warshofsky made no effort to conceal his decision to replace Dr. Sperling and the search for a replacement quickly public knowledge in the hospital.

**H.    The Department of Health Validates Dr. Sperling's Concerns**

95.    In or around November 2021, the New York Department of Health (the "NYDOH") performed a review of the cardiovascular program at Vassar, largely due to outcomes related to the ECMO and TAVR programs.

96.    The NYDOH found that Vassar's cardiovascular program required significant revision of their quality processes.

97.    On the other hand, Vassar's cardiac surgery program consistently received high quality ratings under Dr. Sperling's leadership from the Society of Thoracic Surgeons, with '3-star ratings' throughout Dr. Sperling's tenure, including the block of time covering his last 12 months at Vassar.

**I.    Dr. Sperling Is Placed on a Forced Administrative Leave For Continuing to Complain About Patient Safety**

98.    Dr. Sperling continued to push back at Dr. Warshofsky and the cardiology team even after being told that he would be replaced, into 2022.

99.    In or around September 2022, there was another ECMO case initiated in the cath lab.  Dr. Sperling's surgical partner reported to Dr. Sperling that Cardiology demanded that the patient be taken off ECMO the following day. The surgeon objected because he thought that the patient needed more time on ECMO and that ECMO discontinuation might lead to mortality. In response, the cardiologist threatened to transfer the patient to another hospital if the surgeon refused to take this ~50-year-old salvageable patient off ECMO that day.

100.    Lucky for the patient, when the anesthesiologist came to assess the patient, he agreed that it was too dangerous to remove the patient from ECMO at the time and refused to

participate. The cardiologist transferred the patient to another institution without further discussion

with the surgeons who were instrumental in saving this patient's life.

101.    Upon learning of this, Dr. Sperling advised Ms. Melina, Head of Risk, of the

situation.  He recommended that Dr. Warshofsky be asked to answer for allowing this

dangerous cardiology behavior to continue at Vassar.  In an email sent to Ms. Melina on October

3, 2022 Dr. Sperling wrote:

> I'm not sure where to go with this, but I figured that passing it along to you is probably appropriate. I was not directly involved after Friday, but multiple folks involved on Saturday have expressed concern and disappointment, and I can't not pass it along somehow. Communicating this to Dr. Warshafsky is not likely to be well-received; we really haven't had any meaningful dialogue for several months now.

> Ironically (or not so...), the issue at hand is a recurrence of one of the major reasons (aside from TAVR) for the destruction of my relationship with Dr. Warshafsky and Kelli Stock. You probably recall that the straw that broke the camel's back, and my primary drive to meet with Kerry Eaton and then Dr. Murphy had to do with inappropriate protection of certain cardiologists involved in ECMO cases, and frank refusal to deal with the actual iatrogenic complications and the dangers of cardiology bullying of the heart surgery team in these settings.

> On Friday, there was an emergency ECMO activation for a young patient in his 50's who was in our ICU with a cath the previous day and severe aortic stenosis and multi-vessel CAD. At that time, it was not even known to us that Dr. [name redacted] had intended to send this patient to Columbia for inpatient surgery (we were never called the previous day or night). He manifested VT/VF arrest in the ICU in the morning and was rushed to the cath lab with CPR in progress. With some truly great collaboration, myself and Dr. [name redacted] got the patient on ECMO, performed coronary stenting, balloon aortic valvuloplasty and Impella placement. He stabilized, and even survived an accidental arterial decannulation by Dr. [name redacted] when he tried to move the table for some catheter imaging. The room was well-handled, collaborative, and the patient returned to ICU stable, woke up, followed commands, truly amazing.

> Here's the bad part. Dr. [name redacted] was somehow already planning the ECMO decannulation on Friday. Despite having intended to send the patient into NYC before all the hoopla, he was very comfortable asking me if I would come in on a rare weekend off to do the decannulation if appropriate. On Saturday, apparently Dr. [name redacted] was pushing our

team very hard for decannulation, and the patient was not clinically ready for it. Apparently he was hypoxic with white lungs on the CXR, and this was all more strikingly apparent when flows were diminished on ECMO with tests of weaning. Nobody on the cardiac team – perfusion, PA ([name redacted]), surgeons ([names redacted]) thought that decannulation on that day was safe (mainly hypoxia), but apparently Dr. [name redacted] was pushing and threatening to send the patient to Columbia if our team did not decannulate. I believe some of the interactions were very unfriendly and non-collegial (please reach out to Dr. [names redacted]). The one saving grace was that the anesthesiologist, Dr. [name redacted], assessed the patient and refused to do the decannulation because of the immense pulmonary risk and risk of mortality. Thank goodness there was one doctor involved who does not work for Nuavnce or answer directly to Dr. Warshafsky or the Heart Center. Based on what [name redacted] told me, this patient could not have survived decannulation. Apparently, without further discussion or notification, Dr. [name redacted] transferred the patient to Columbia. Wow. You're welcome for the save, right?

The reason I am passing this on to you? Because when I brought nearly-identical instances of ECMO bullying by our cardiologists to Dr. Warshafsky last year, he set up that ambush meeting where cardiology didn't have to answer for anything: iatrogenic bleeding complications, bullying us in ECMO management. He vilified the surgery team for not being collegial, and used Dr. Kaplon to back him up. Our main argument was that it is not 'not collegial' if you have substantially more expertise in these situations and disagree with cardiology's suggestions or a frank demand to simply remove the ECMO when we thought it would result in severe harm or patient death.

I just need to say this very clearly. Collegial conversations are always welcome. But demands like this of the cardiac surgery team are inappropriate and dangerous to the patients. I brought all of this and the TAVR issues to Dr. Murphy last year to make the point that Dr. Warshafsky is adversely affecting the (necessary) balance of power between cardiology and cardiac surgery. I am glad that the team was not bullied into a terrible mistake with this patient, and also sorry to see that collegial behavior continues to be only a one-way street here, where surgery is expected to drop everything, bend over backwards and pitch in when requested, but really we need be prepared to blindly follow our cardiology partners' demands without being able to object, without retaliation.

I do not see how this can be fixed at Vassar without eliminating cardiac surgery being stifled by Dr. Warshafsky and the Heart Center when it suits them. This absence of equipoise is dangerous, and we have all been slipping and falling on the ice in a recurring fashion.

102.    Two days later, on October 5, 2022,  Dr. Warshofsky, Ms. Stock and Ms. Miller met with Dr. Sperling and placed him on paid administrative leave.

103.    Not only was this "placement on paid administrative leave" unlawful retaliation, it violated Section 7(d) of Dr. Sperling's Employment Agreement, which provides:

> <u>Suspension</u>.  The Group reserves the right to suspend Physician from actively providing services for a reasonable time, with compensation, in instances where the Group reasonably determines that Physician's continued activity puts at risk the health and safety of any patients, fellow employees, or the Physician. Such suspension may be followed by termination of the Employment Period pursuant to this Section 7 or reinstatement of the Physician to active service.

104.    At no point did Nuvance assert – nor could it with any reasonable basis – that Dr. Sperling's "continued activity puts at risk the health and safety of any patients, fellow employees, or the Physician."

105.    To the contrary, Dr. Sperling was told that he could continue to treat patients through the end of the week.

106.    During his conversation with Dr. Warshofsky, Ms. Stock and Ms. Miller on October 5, 2022, they told Dr. Sperling that Nuvance was placing him on administrative leave to make room for his replacement, Dr. Abeel Mangi.

107.    The forced administrative leave damaged Dr. Sperling.  A previously highly regarded cardiac surgeon, he was forced to look for new employment while being excluded from practicing heart surgery at Vassar.

108.    Ultimately, Dr. Sperling was unable to find any job in the New York region, or any equivalent job, and instead accepted a job at substantially lower pay in the Midwest.

**FIRST CAUSE OF ACTION**
**VIOLATION OF NYLL § 740**

109.    Dr. Sperling repeats and realleges the allegations set forth in paragraphs above as though fully set forth herein.

110.    NYLL § 740(2) provides:

An employer shall not take any retaliatory action against an employee, whether or not within the scope of the employee's job duties, because such employee does any of the following:

>    (a)  discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation or that the employee reasonably believes poses a substantial and specific danger to the public health or safety;

>    (b)  provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any such activity, policy or practice by such employer; or

>    (c)  objects to, or refuses to participate in any such activity, policy or practice.

111.    Dr. Sperling is an "employee" as defined by NYLL § 740.

112.    Nuvance was Dr. Sperling's "employer" as defined by NYLL § 740.

113.    Nuvance's actions against Dr. Sperling, including refusing to hire another cardiac surgeon, demoting him, restricting him from active practice during the last 9 months of his contract (in violation of his Employment Agreement) and terminating him by refusing to renew his Employment Agreement constitute "retaliatory action" as defined by NYLL § 740.

114.    Nuvance's retaliatory action were in response to Dr. Sperling's repeated disclosures to supervisors (including Dr. Warshofsky and his managers) and his objections to medical procedures – specifically TAVR and ECMO – which Dr. Sperling reasonably believed constituted

22

a specific danger to the public health or safety of Vassar's patients and/or to be in violation Medicare reimbursement rules.

115.    Nuvance's retaliatory action in violation of NYLL § 740 has severely damaged Dr. Sperling, damaging his future earnings by at least $9 million, causing him severe emotional distress, and entitling him to all damages available, including punitive damages, interest and attorneys' fees and costs.

### SECOND CAUSE OF ACTION
### VIOLATION OF NYLL § 741

116.    Dr. Sperling repeats and realleges the allegations set forth in paragraphs above as though fully set forth herein.

117.    NYLL § 741(2) provides:

Notwithstanding any other provision of law, no employer shall take retaliatory action against any employee because the employee does any of the following:

(a)  discloses or threatens to disclose to a supervisor, or to a public body an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care;  or

(b)  objects to, or refuses to participate in any activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care.

118.    Dr. Sperling is an "employee" as defined by NYLL § 741.

119.    Nuvance was Dr. Sperling's "employer" as defined by NYLL § 741.

120.    Nuvance's actions against Dr. Sperling, including refusing to hire another cardiac surgeon, demoting him, restricting him from active practice during the last 9 months of his contract (in violation of his Employment Agreement) and terminating him by refusing to renew his Employment Agreement constitute "retaliatory action" as defined by NYLL § 741.

121.     Nuvance's retaliatory action were in response to Dr. Sperling's repeated disclosures to supervisors (including Dr. Warshofsky and his managers) and his objections to medical procedures – specifically TAVR and ECMO – which Dr. Sperling reasonably believed constituted a specific danger to the public health or safety of Vassar's patients and/or to be in violation Medicare reimbursement rules.

122.     Dr. Sperling specifically "brought the improper quality of patient care to the attention of a supervisor and [ ] afforded [Nuvance] a reasonable opportunity to correct such activity, policy or practice," as required by NYLL § 741.

123.     Nuvance's retaliatory action in violation of NYLL § 741 has severely damaged Dr. Sperling, damaging his future earnings by at least $9 million, causing him severe emotional distress, and entitling him to all damages available pursuant to NYLL § 740(5), including punitive damages, interest and attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### <u>BREACH OF CONTRACT</u>

124.     Dr. Sperling repeats and realleges the allegations set forth in paragraphs above as though fully set forth herein.

125.     Dr. Sperling's Employment Agreement is a valid and binding contract.

126.     As the legal successor to the original signatory, Nuvance is bound by the Employment Agreement.

127.     Dr. Sperling fully performed his obligations under the Employment Agreement.

128.     Nuvance breached the Employment Agreement by failing to pay Dr. Sperling all monies due.

129.   Dr. Sperling's Employment Agreement provides:

a.   In Exhibit A, Section 6(a) a bonus for Nuvance's "pay for performance incentive program as further described in Group's Compensation Policy, which includes potential for an additional $104,000 incentive based on meeting clinical measures." (the "Performance Bonus.")

b.   In Exhibit A, Section 6(b) a "Call Coverage Bonus" for "call coverage in excess of a quarterly ratio of 1 in 3 days." (the "Call Coverage Bonus").

c.   An administrative bonus of $26,000 "based on meeting certain measures as agreed by Physician and Group (the "Administrative Bonus")

130.   For 2018 to 2021, Dr. Sperling clinical measures were set and he met or exceeded these measures, earning the Performance Bonus, or most of it.

131.   For 2018 to 2021, Dr. Sperling administrative measures were set and met, earning the Administrative Bonus.

132.   The Call Coverage Bonus is due as follows:

If, during the Employment Period, the number of filled positions for CT surgeons falls below three, and Physician is required to take call at a rate in excess of 1:3, then the Group shall have ninety (90) days from the date the departing CT surgeon leaves the Group to hire a new surgeon or locums surgeon.  If the Group fails to make reasonable efforts to recruit or refuses to hire qualified candidates (either employed or through a locums arrangement) who are presented to the Group within ninety (90) days, the Group shall, as a penalty, pay the Physician $2,000 per day (or a pro-rata hourly rate) for call coverage in excess of 1 in 3 days.  In the event the Group fails to make reasonable efforts to recruit or refuses to hire qualified candidates (either employed or through a locums arrangement) who are presented to the Group within one hundred and eighty (180) days, the Group shall, as a penalty, pay the Physician $3,000 per day (or a pro-rata

hourly rate) for call coverage in excess of 1 in 3 days until such time as a new surgeon or locums surgeon is hired  These payments are intended to incentivize the Group to work diligently and cooperatively with the Physician to expedite the hiring of a new surgeon and/or a suitable locums candidate.

133.    After terminating a surgeon in 2020, Nuvance had only two cardiovascular surgeons, Dr. Sperling and his surgical partner, and also had a few locums, some of whom left because of issues with the cardiologists.

134.    Further, in retaliation for Dr. Sperling's complaints and meeting with his managers, in 2021, Dr. Warshofsky rejected a qualified cardiovascular surgeon who Dr. Sperling wanted to hire and was qualified for the position.

135.    As a result, for 2022, Dr. Sperling was forced to provide excess call coverage and is due:

| Dates | Calculation | Total |
|---|---|---|
| February – April | 3.34 days @ $1,000/day | $3,340 |
| May – August | 6.34 days @ $2,000/day | $12,680 |
| September – October | 8.67 days @ $3,000/day | $26,010 |
| | **Total** | **$42,030** |

136.    Dr. Sperling was only paid $17,010 ($6,670 + $10,340) and thus is due $42,030-$17,010 = $25,020.

137.    Dr. Sperling is also due $104,000 for the Performance Bonus, and $26,000 for the Administrative Bonus, for which he met all objectives for 2022.

138.    After his "placement on administrative leave" Dr. Sperling requested payments due for the Performance Bonus, the Call Coverage Bonus and the Administrative Bonus payments, but Nuvance refused.

139.    After repeatedly reaching out to Dr. Warshofsky, Ms. Miller and others, on December 16, 2022, Dr. Sperling was forced to engage counsel, who made specific demand for the wages due.

140.    Thereafter, Nuvance agreed to pay Dr. Sperling $78,000 for the Performance Bonus and nothing for the Administrative Bonus.

141.    Nuvance, without meaningful explanation, summarily claimed that Dr. Sperling did not meet his administrative goals.  With respect to the performance goals, Nuvance unilaterally reset the goals and paid Dr. Sperling only 75% of the amount due.

142.    Thus, Nuvance breached Dr. Sperling's employment agreement refusing to pay: (i) 25% of his Performance Bonus, meaning $26,000, (ii) the Administrative Bonus, also $26,000, and (iii) the Call Coverage Bonus in the amount of $25,020.

143.    Dr. Sperling was damaged by this breach.

144.    In total, Dr. Sperling is thus due under the employment agreement $77,020, plus interest from the earliest date of the breach.

**FOURTH CAUSE OF ACTION**
**<u>VIOLATION OF NEW YORK LABOR LAW – FAILURE TO PAY WAGES</u>**

145.    Dr. Sperling repeats and realleges the allegations set forth in paragraphs above as though fully set forth herein.

146.    Dr. Sperling was an "employee" as that term is defined in NYLL § 190(2).

147.    The Performance Bonus, Administrative Bonus and Call Coverage Bonus each and all constitute "wages," as that term is defined in NYLL § 190(1).

148.    Nuvance was Dr. Sperling's "employer" as that term is defined in NYLL § 190(3).

149.    Nuvance intentionally failed to pay Dr. Sperling $77,020, requiring Dr. Sperling to bring this action to recover his wages.

150.    Nuvance cannot show that it acted in "good faith" in denying Dr. Sperling his wages, and therefore in addition to attorneys' fees and interest, Nuvance must also be required to pay liquidated damages equaling the amount of unpaid wages.

151.    Prior to 2021, employers sometimes escaped the NYLL obligation to pay liquidated damages and attorneys' fees because there existed conflicting case law in which employers relied to escape the mandate of NYLL §198(1-a).  In August 2021, New York closed any opening that employers could rely upon, passing the "No Wage Theft Loophole Act" and explaining in the legislative findings:

> Article 6 of the labor law, and sections 193 and 198(3) in particular, reflects New York's longstanding policy against the forfeiture of earned but undistributed wages. The purpose of this remedial amendment is to clarify that: (a) the unauthorized failure to pay wages, benefits and wage supplements has always been encompassed by the prohibitions of section 193, *see, e.g., Ryan v. Kellogg Partners Inst. Servs.*, 19 N.Y. 3d 1, 16 (2012) (correctly holding that employer's neglect to pay sum that constitutes a "wage" violated section 193); and (b) consistent with established principles of statutory construction, section 193 should be harmonized with section 198(3)'s guarantee ***that "All employees shall have the right to recover full wages, benefits and wage supplements and liquidated damages*."** A wage is either owed or it is not. The legislature thus finds that it has a responsibility to harmonize these two sections of the labor law to clarify for the courts once and for all that wage theft remains completely and without exception in violation of statute and all employees are entitled to full wages, benefits and wage supplements earned.

*See* No Wage Theft Loophole Act, § 1, https://www.nysenate.gov/legislation/bills/2021/S858 (emphasis added).

152.    In explaining the closing of the loophole, the sponsoring memo explained:

> This loophole is not merely a topic for law journal articles. Attorneys representing laborer plaintiffs speak of real-life cases where plaintiffs are deprived of their earned wages, and then

28

deprived of a remedy under the Labor Law by courts that misread the law.

It is thus necessary for the legislature to close this judicially-created loophole once and for all to clarify that employees must be paid what they are owed, no matter what New York cannot in good faith claim to be one of the most progressive states in the nation when it comes to labor rights if we fail to clarify that wage theft is, and has always been, completely prohibited within our boundaries.

*See* Sponsor Memo, https://www.nysenate.gov/legislation/bills/2021/S858

153.    Thus, NYLL § 198(1-a) ***requires*** in such circumstances that Sperling recover the full amount of any underpayment, all reasonable attorney's fees, prejudgment interest as required under the civil practice law and rules[4], and, unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law, an additional amount as liquidated damages equal to one hundred percent of the total amount of the wages found to be due …"

154.    Under NYLL, Nuvance's intentional and/or bad faith failure to pay, withholding and/or deducting from Sperling his wages entitles him to recover such wage plus nine percent interest, attorneys' fees, costs, expenses, and liquidated damages equal to one hundred percent of the unpaid wage (the total amount to be determined at trial but believed to be in excess of $77,020).

## PRAYER FOR RELIEF

WHEREFORE the Plaintiff prays that this Court:

A.    Award nominal, compensatory, liquidated, and punitive damages to Plaintiff in an amount to be determined at trial;

B.    Award litigation costs and expenses to Plaintiff, including, but not limited to, reasonable attorneys' fees;

---

[4]    CPLR § 5004 requires simple interest of 9% per annum, which must be computed from the date the wages were due per CPLR §5001.

C.      Award back pay, front pay, lost benefits, preferential right to jobs, and other damages for lost compensation and job benefits with pre-judgment and post-judgment interest suffered by Plaintiff.

D.      Order Defendant to make whole Plaintiff by providing him with appropriate lost earnings and benefits and other affirmative relief; and

E.      Award any additional and further relief as this Court may deem just and proper.

**DATED:**      New York, New York
               October 26, 2023

                                        By:    /s/ Robert Glunt
                                               Robert Glunt

                                        MANDEL BHANDARI LLP
                                        Robert Glunt
                                        80 Pine Street, 33rd Floor
                                        New York, NY 10005
                                        T:  (212) 269-5600
                                        F:  (646) 964-6667
                                        glunt@mandelbhandari.com

                                        *Attorneys for Plaintiff Jason Sperling M.D.*

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues triable of right by Jury.

**DATED:**      New York, New York
                October 26, 2023
                                    By:    /s/ Robert Glunt
                                    _____
                                    Robert Glunt

                                    MANDEL BHANDARI LLP
                                    Robert Glunt
                                    80 Pine Street, 33rd Floor
                                    New York, NY 10005
                                    T:  (212) 269-5600
                                    F:  (646) 964-6667
                                    glunt@mandelbhandari.com

                                    *Attorneys for Plaintiff Jason Sperling M.D.*