UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
JASON SPERLING, M.D.,                          :
                     Plaintiff,               :
                                          :          **OPINION AND ORDER**

v.                                             :
                                          :          23 CV 9434 (VB)
NUVANCE HEALTH MEDICAL                          :
PRACTICE, P.C.,                                :
                    Defendant.               :
-------------------------------------------------------------x

Briccetti, J.:

Plaintiff, Jason Sperling, M.D., brings this action against defendant Nuvance Health

Medical Practice, P.C. ("Nuvance"). Plaintiff asserts claims for (i) whistleblower retaliation in

violation of New York Labor Law ("NYLL") Sections 740 and 741, (ii) breach of contract, and

(iii) failure to pay wages under NYLL Section 193.

Now pending is defendant's motion for summary judgment. (Doc. #56).

For the reasons set forth below, defendant's motion is GRANTED IN PART and

DENIED IN PART.

The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

**BACKGROUND**

The parties have submitted briefs, declarations with exhibits, and statements of material

facts pursuant to Local Civil Rule 56.1.[1] These submissions reflect the following factual

background.

---

[1] Nuvance urges the Court to disregard plaintiff's Rule 56.1 counterstatement because it improperly adds immaterial facts and misrepresents the record. (Doc. #75 at 1–2). To be sure, plaintiff's Rule 56.1 counterstatement includes several "additional facts" which are immaterial to the instant motion or otherwise inadequately supported by the record. However, the Court does not find that plaintiff's Rule 56.1 counterstatement contravenes the purposes of Rule 56.1 such that it should be stricken. See Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001),

Nuvance is a medical group that employs physicians across a network of hospitals.  One of those hospitals is Vassar Brothers Medical Center ("VBMC") in Poughkeepsie, New York.  Beginning in 2018, plaintiff was employed by Nuvance as Chief of Cardiac Surgery ("Chief") at VBMC.  (Doc. #62 at ¶ 2).  As Chief, plaintiff was responsible for performing heart surgeries, supervising other cardiac surgeons, and fostering a collaborative relationship with the members of VBMC's structural heart team, including cardiologists.  (Id. at ¶ 10).

The terms of plaintiff's employment were set forth in a physician employment agreement.[2]  Relevant to this case, Section 7(d) of the employment agreement, titled "Suspension," provides:

> [Nuvance] reserves the right to suspend Physician from actively providing services for a reasonable time, with compensation, in instances where [Nuvance] reasonably determines that Physician's continued activity puts at risk the health and safety of any patients, fellow employees, or the Physician.  Such suspension may be followed by termination of the Employment Period . . . or reinstatement of the Physician to active service.

(Doc. #68–21 at ECF 4).[3]

In addition, Section 6 of Exhibit A to the employment agreement details plaintiff's compensation.  Section 6(b) enabled plaintiff to receive increased rates for call coverage if "the number of filled positions for [cardiothoracic] surgeons falls below three" and Nuvance "fails to make reasonable efforts to recruit or refuses to hire qualified candidates (either employed or

---

abrogated on other grounds by Cement and Concrete Workers Dist. Council Welfare Fund v. Manny P. Concrete Co., Inc., 145 F.4th 204 (2d Cir. 2025) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.").

[2]    Plaintiff's employment agreement was signed with Health Quest Medical Practice, P.C., which later merged with Western Connecticut Health Network to become Nuvance.  (Doc. #57 at 2 n.3).

[3]    "ECF ___" refers to page numbers automatically assigned by the Court's Electronic Case Filing System.

through a locums arrangement)."[4] (Doc. #68–21 at ECF 9). These increased rates were intended "to incentivize [Nuvance] to work diligently and cooperatively with the Physician to expedite the hiring of a new surgeon and/or a suitable locums candidate." (Id.)

Throughout his tenure at VBMC, plaintiff reported problems with the manner in which VBMC performed two types of medical procedures: trans-catheter aortic valve replacement ("TAVR") and extracorporeal membrane oxygenation ("ECMO"). Plaintiff raised his concerns about these procedures to his supervisor, Dr. Daniel O'Dea. (Doc. #68–43 at Tr. 211–13, 224). According to plaintiff, Dr. O'Dea discouraged him from continuing these reports. (Doc. #57–5 at Tr. 202).

In 2019, VBMC temporarily suspended TAVR procedures after two consecutive TAVR related patient deaths. (Doc. #57–8 at Tr. 22). Shortly thereafter, VBMC engaged an outside consultant to review the TAVR program. (Id. at Tr. 23). VBMC also created a weekly TAVR task force and implemented recommendations from the outside consultant. (Doc. #57–4 at Tr. 174–75, 181).

In August 2019, plaintiff reported to Dr. O'Dea and Nuvance Chief Operating Officer, Kerry Eaton, that surgeons were not meaningfully engaging in TAVR procedures, which could have an impact on procedural safety. (Doc. #67–3 at ECF 1). Plaintiff specifically expressed his concern that Dr. Zubair Jafar, a cardiologist, was responsible for eroding the engagement of the surgeons. (Id.).

---

[4]    A "locums arrangement" refers to a medical staffing arrangement whereby healthcare providers fill in on a temporary basis.

Beginning in 2020, plaintiff was supervised by Dr. Mark Warshofsky, who replaced Dr. O'Dea as Senior Vice President and System Chair of Nuvance's Heart and Vascular Institute. At this time, Kelli Stock was the Vice President of the Heart and Vascular Institute.

In September 2020, plaintiff and another cardiac surgeon, Dr. Alon Aharon, met with Dr. Warshofsky and Ms. Stock, to discuss "threats" Dr. Aharon received from another VBMC cardiologist, Dr. Rejeev Narayan. (Doc. #63 at ¶ 13). Dr. Aharon reported that Dr. Narayan claimed he and his group had gotten a previous cardiac surgeon fired and could do the same to plaintiff and Dr. Aharon if they did not "keep [their] distance and cease complaining about problems with TAVR." (Id.). According to Dr. Aharon, Dr. Narayan specifically mentioned plaintiff's reports about TAVR procedures. (Id.). It was Dr. Aharon's understanding that Dr. Narayan spoke on behalf of a broader group of cardiologists. (Id.). Dr. Warshofsky and Ms. Stock prepared a memorandum documenting the meeting and the reported threats. (Doc. #68–10). Dr. Warshofsky subsequently spoke with Drs. Narayan and Jafar about their role in promoting a collaborative environment. (Doc. #57–1 at ¶ 10).

In January 2021, a meeting was held to address frequent ECMO complications. After the meeting, plaintiff emailed Dr. Warshofsky to complain about the hostility of several cardiologists, including Drs. Narayan and Jafar. (Doc. #67–4 at ECF 2). Plaintiff believed these cardiologists tried to "recus[e] themselves of any responsibility" for ECMO deaths, when in fact they were "primarily responsible" and showed a "misunderstanding" of proper ECMO procedures. (Id.). Dr. Warshofsky did not share plaintiff's concerns, and told plaintiff "[b]ottom line, we need true leadership on all sides. I anticipate your continued assistance in improving the culture as well as holding team members to expectations of behavior and performance." (Id. at ECF 1). Plaintiff forwarded this email chain to Dr. Jeffrey Nicastro, Nuvance's Chief Medical

Officer, and expressed his belief that Dr. Warshofsky favored cardiologists over cardiac surgeons. (Id.).

In March 2021, plaintiff reported to Dr. Warshofsky that Drs. Narayan and Jafar "were antagonizing" Dr. Aharon during a TAVR procedure in a manner which would be dangerous for the patient. (Doc. #68–3 at ECF 1). In response, Dr. Warshofsky acknowledged he had told plaintiff to stop reporting these concerns to other administrators due to the "nature and frequency" of plaintiff's previous reports. (Id.).

In May 2021, Dr. Warshofsky received complaints from cardiologists that plaintiff was not communicating with them and was making unilateral decisions. (Doc. #57–2 at Tr. 172–73). Dr. Warshofsky relayed this feedback to plaintiff in an email with the subject line "Communication and Canceling of Patients." (Doc. #57–7 at ECF 10). In response, plaintiff changed the subject line of Dr. Warshofsky's email to "Nickels and Dimes" because he did not believe the issue was important. (Id. at 10–11; Doc. #57–5 at Tr. 357–58). Dr. Warshofsky told plaintiff his response to feedback was "disappointing in many respects." (Doc. #57–7 at ECF 10).

In June 2021, another cardiac surgeon, Dr. Arie Blitz, reported concerns to plaintiff regarding the lack of meaningful surgeon participation during TAVR procedures. (Doc. #68–19 at ECF 3–4). Plaintiff discussed Dr. Blitz's concerns with Dr. Warshofsky. (Id. at ECF 2–3). Also in the summer of 2021, there were "multiple serious vascular complications" related to ECMO procedures. (Doc. #67 at ¶ 26). Plaintiff recommended to Dr. Warshofsky that Nuvance stop ECMO initiations until it could ensure patient safety. (Id. at ¶ 27).

In August 2021, Dr. Warshofsky learned through a human resources investigation that non-physician staff feared retaliation from plaintiff. (Doc. #57–1 at ¶ 13). Dr. Warshofsky also

received concerns about plaintiff's leadership from cardiologists with whom plaintiff did not have previous issues. (Id. at ¶ 12). On September 3, 2021, Dr. Warshofsky messaged a cardiologist that he believed the best course of action would be to look for a new Chief. (Doc. #57–1 at ECF 15). The cardiologist encouraged Dr. Warshofsky to do so because of plaintiff's failure to "maintain basic cordial relationships with anyone." (Id.). Later that same day, another cardiologist emailed Dr. Warshofsky that plaintiff was "unprofessional," and showed a "lack of team work" during patient care. (Id. at ECF 17).

After considering this information, Dr. Warshofsky and Ms. Stock decided to remove plaintiff as Chief. (Doc. #57–1 at ¶ 16). Dr. Warshofsky told Ms. Eaton that plaintiff was being removed because he "did not have good relationships with a significant portion of the cardiology team." (Doc. #68–37 at Tr. 49–50). Dr. Warshofsky testified he and Ms. Stock made the decision to remove plaintiff as Chief in September 2021. (Doc. #57–1 at ¶ 16); (Doc. #68–46 at Tr. 190). Ms. Stock could not recall when they made the decision. (Doc. #68–45 at Tr. 148–49). Dr. Warshofsky and Ms. Stock did not inform plaintiff of any decision until November 2021.

On November 2, 2021, plaintiff met with Nuvance CEO, Dr. John Murphy. In this meeting, plaintiff reported to Dr. Murphy the same problems with TAVR and ECMO procedures which he had been reporting to Dr. Warshofsky. (Doc. #67 at ¶ 30).

Later that day, Dr. Warshofsky and Ms. Stock informed plaintiff he was being removed as Chief. (Doc. #67–5). Dr. Warshofsky explained to plaintiff he was being removed because he had lost the faith of the cardiologists. (Id. at ECF 1; Docs. ##1 at ¶ 90; 15 at ¶ 90). Plaintiff disagreed with Dr. Warshofsky's assessment of his relationships. (Doc. #67–5 at ECF 1). After learning of Dr. Warshofsky's intention to look for a new Chief, plaintiff stated "I'm not going to be here if you have a new chief, obviously." (Id. at ECF 2).

6

Plaintiff continued working at Nuvance after this meeting.  Plaintiff also continued reporting problems with TAVR and ECMO procedures.  In 2022, after a spike in TAVR complications, Nuvance involved another outside consultant to again review the TAVR program. (Doc. #57–4 at 183–84).

In September 2022, Nuvance hired Dr. Abeel Mangi to replace plaintiff as Chief.  (Doc. #57–2 at ECF 57).  On October 4, 2022, Dr. Warshofsky and Ms. Stock informed plaintiff he was being placed on administrative leave for the remainder of his contract, ending July 15, 2023. (Doc. #57–1 at ¶¶ 22–23).  Plaintiff was not subject to disciplinary suspension, nor were his medical staff privileges suspended.  (Id.).  Plaintiff received his full salary and benefits for the entirety of the administrative leave.  (Doc. #62 at ¶ 32).

**DISCUSSION**

I.    Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp v. Catrett, 477 U.S. 317, 322 (1986).[5]

A fact is material when it "might affect the outcome of the suit under governing law . . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party.  See Anderson v. Liberty Lobby,

---

[5]    Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

Inc., 477 U.S. at 248.  The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010).  It is the moving party's burden to establish the absence of any genuine issue of material fact.  Zalaski v. Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof, then summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. at 323.  If the non-moving party submits "merely colorable" evidence, summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts and may not rely on conclusory allegations or unsubstantiated speculation."  Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011).  "[T]he mere existence of a scintilla of evidence" supporting the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for it.  Dawson v. Cnty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes all facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party.  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor, on the issue on which summary judgment is sought, summary judgment is improper.  Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004).

II.    Whistleblower Retaliation Claims

Nuvance argues it is entitled to summary judgment on plaintiff's whistleblower retaliation claims under Sections 740 and 741 of the New York Labor Law.

8

The Court disagrees.

A.      Legal Standard[6]

Section 740 states that "[a]n employer shall not take any retaliatory action against an employee . . . because such employee . . . discloses, or threatens to disclose to a supervisor . . . an activity, policy, or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation or that the employee reasonably believes poses a substantial and specific danger to the public health or safety."  N.Y. Lab. L. § 740(2)(a).  Section 741 in turn offers specialized protections to individuals "perform[ing] health care services" who "disclose[] . . . an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care."  N.Y. Lab. L. § 741(2)(a).

To violate New York's whistleblower statutes, the retaliatory action "must be taken because the employee engaged in protected activity.  In other words, the whistleblower statute[s] . . . require[] some causal connection between an adverse personnel action and a report of dangerous activity."  Duarte v. St. Barnabas Hosp., 265 F. Supp. 3d 325, 354 (S.D.N.Y. 2017) (citing Varughese v. Mount Sinai Med. Ctr., 2015 WL 1499618, at *66–68 (S.D.N.Y. Mar. 27, 2015), aff'd, 693 F. App'x 41, 41–42 (2d Cir. 2017)).

---

[6]      Nuvance says it remains an open question whether New York State whistleblower retaliation claims are evaluated under the burden shifting framework from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  (Doc. #57 at 13).  But Nuvance has provided no compelling authority for that position.  At best, it points to Mason v. New York Univ., which analyzed a claim pursuant to NYLL § 741 in roughly the same order prescribed by McDonnell Douglas.  2024 WL 3675742, at *10–13 (N.Y. Sup. Ct. Aug. 6, 2024).  However, the court in Mason did not so much as mention the McDonnell Douglas burden shifting framework—let alone adopt it in the context of NYLL whistleblower retaliation claims.  Id.  And, to the contrary, courts in this district have plainly held such claims are not analyzed under the McDonnell Douglas framework.  See Duarte v. St. Barnabas Hosp., 265 F. Supp. 3d 325, 354 (S.D.N.Y. 2017); Kaye v. New York City Health and Hosp. Corp., 2023 WL 2745556, at *24 (S.D.N.Y. Mar. 31, 2023).  The Court agrees with these district court decisions and, accordingly, will not evaluate plaintiff's claims under the McDonnell Douglas framework.

9

It is a defense to claims under Sections 740 and 741 that the personnel action was based on a valid reason apart from retaliation for whistleblowing.  See Thompson v. Jamaica Hosp. Med. Ctr., 2016 WL 4556905, at *4 (S.D.N.Y. Aug. 30, 2016); Luiso v. Northern Westchester Hosp. Ctr., 65 A.D.3d 1296, 1298 (2d Dep't 2009).

B.    Application

Nuvance argues it is entitled to summary judgment because plaintiff cannot establish a causal connection between his protected activity and any adverse employment action.[7]

An inference of a causal connection can be raised "by showing that the protected activity was closely followed in time by the adverse employment action."  Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001); see also Rackley v. Constellis, 2024 WL 3498718, at *31 (S.D.N.Y. June 17, 2024).  There is no bright line rule as to the outer limits beyond which a temporal relationship is too attenuated to support causation.  Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010).  Rather, the Court must "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context" of this particular case.  Summa v. Hofstra Univ., 708 F.3d 115, 128 (2d Cir. 2013).

Here, plaintiff was removed as Chief on November 2, 2021, only hours after he reported problems with TAVR and ECMO procedures to Dr. Murphy.  (Docs. ##67 at ¶¶ 30–31; 68–31).  This close temporal proximity supports an inference of causation.

---

[7]    Although Nuvance does not concede plaintiff engaged in protected activity under Sections 740 and 741 of the New York Labor Law, it offers no argument in support of its position that plaintiff's activity was not protected.  (Doc. #57 at 14 n.13).  The Court declines to consider Nuvance's undeveloped argument that plaintiff's activity was not protected.  See Chevron Corp v. Donziger, 2013 WL 4045326, at *1 n.3 (S.D.N.Y. Aug. 9, 2013).  In any event, Nuvance's motion fails because, for the reasons detailed in this opinion, a genuine issue of material fact exists as to whether plaintiff was removed as Chief in retaliation for his whistleblowing.

10

Nuvance disputes this timeline, arguing Dr. Warshofsky and Ms. Stock decided to remove plaintiff as Chief in September 2021—well before plaintiff's reports to Dr. Murphy.  Of course, temporal proximity cannot support causation when the adverse employment action predates the protected activity.  Thacker v. HSBC Bank USA, N.A., 2023 WL 3061336, at *7 (S.D.N.Y. Apr. 24, 2023).

However, there remains a genuine dispute of material fact as to when the decision to remove plaintiff as Chief was actually made.  On September 3, 2021, Dr. Warshofsky messaged another cardiologist that he believed the best course of action would be to look for a new Chief. (Doc. #57–1 at ECF 15).  And Dr. Warshofsky has affirmed that he and Ms. Stock made the decision to remove plaintiff as Chief in September 2021.  (Id. at ¶ 16).  But Dr. Warshofsky's message and testimony do not demonstrate definitively that the decision was made in September 2021, especially considering that plaintiff was not informed of the decision until November 2, 2021.  And a jury would not be required to credit Dr. Warshofsky's testimony to that effect. Further, Ms. Stock could not recall when she and Dr. Warshofsky made the decision to remove plaintiff.  (Doc. #68–45 at Tr. 148–49).  Construing all facts in plaintiff's favor, the uncertainty as to the timeline of events weighs against granting Nuvance summary judgment.  See Hutchison v. New York Health and Hosp. Corp., 2025 WL 1984371, at *8 (N.Y. Sup. Ct. June 20, 2025).

Even if—as Nuvance claims—the decision to remove plaintiff as Chief was made in September 2021, there is evidence plaintiff made several complaints about TAVR and ECMO procedures in the preceding months.  For example, in the summer of 2021, plaintiff urged Dr. Warshofsky to stop ECMO initiations until Nuvance could ensure patient safety.  (Doc. #67 at ¶¶ 26–27).  In March 2021, plaintiff reported to Dr. Warshofsky that Drs. Narayan and Jafar were behaving dangerously during a TAVR procedure.  (Doc. #68–3 at ECF 1–2).  In late January

11

2021, plaintiff asserted ECMO related deaths were caused by cardiologists' misunderstanding of ECMO procedures.  (Doc. #67–4 at ECF 2).  These reports are not so temporally remote that a jury would be precluded from inferring a causal link to plaintiff's removal as Chief.  See Summa v. Hofstra Univ., 708 F.3d at 128–29 (finding a seven-month gap between protected activity and termination was sufficient to raise an inference of causation).  And reading the record in the light most favorable to plaintiff, these reports were only the latest in plaintiff's "ongoing, escalating complaints about patient safety."  (Doc. #61 at 1); Noble v. 93 Univ. Place Corp., 303 F. Supp. 2d 365, 374 (S.D.N.Y. 2003) (finding causation in Section 740 claim where plaintiff "complained repeatedly over several months").

In addition to temporal proximity, "the materials before the Court must be carefully scrutinized for circumstantial evidence that could support an inference of retaliatory animus." Dougherty v. Memorial Sloan-Kettering Cancer Ctr., 2002 WL 1610916, at *6 (S.D.N.Y. July 22, 2002).  Here, Dr. Warshofsky acknowledged over email that the "nature and frequency" of plaintiff's previous reports led him to tell plaintiff to stop reporting these concerns to other administrators.  (Doc. #68–3 at ECF 1).  Plaintiff's original supervisor, Dr. O'Dea, similarly discouraged him from making reports about Dr. Jafar.  (Doc. #57–5 at Tr. 202).  Although not direct evidence of retaliatory animus, this circumstantial evidence further supports an inference of causation.  Mason v. New York Univ., 2024 WL 3675742, at *12–13 (finding an inference of retaliatory intent when plaintiff's supervisor warned him against complaining).

For its part, Nuvance has introduced evidence plaintiff was removed for poor performance, "a valid reason apart from his whistleblowing that serves as a complete defense to claims under § 740 and § 741."  Thompson v. Jamaica Hosp. Med. Ctr., 2016 WL 4556905, at *4.  Specifically, Nuvance contends plaintiff was removed as Chief not in retaliation for his

whistleblowing, but "because he was failing to perform one of the most important aspects of his job—to be a leader of VBMC's structural heart team."  (Doc. #57 at 20).

Indeed, the record is replete with evidence that plaintiff fostered a negative work environment (Doc. #68–45 at Tr. 149), had fraught relationships with those he supervised (Docs. ##57–1 at ¶11, ECF 15, 17; 67–4), and showed no interest in improving as a leader or repairing relationships (Docs. ##57–1 at ECF 15; 57–7 at ECF 10–11).  See also Geldzahler v. New York Med. Coll., 746 F. Supp. 2d 618, 633 (S.D.N.Y. 2010) (granting summary judgment to employer when there was no dispute plaintiff's termination was based on his disagreements with colleagues rather than his complaints).  Nuvance has also introduced evidence that it actively investigated issues with its TAVR and ECMO procedures.  (Docs. ##57–4 at Tr. 183–84; 57–8 at Tr. 22).

However, there is still a genuine issue of material fact as to whether plaintiff was removed as Chief because of his whistleblowing.  Plaintiff has introduced evidence that he had good relationships with those he supervised, with the exception being the cardiologists he reported.  (Docs. ##63 at ¶ 6; 64 at ¶ 6; 67 at ¶ 7; 67–1).  And Ms. Stock testified the determination that cardiologists lost confidence in Dr. Sperling was based on discussions with multiple cardiologists—including Dr. Jafar and possibly others whom plaintiff reported for misconduct.[8]  (Doc. #68–45 at Tr. 150).  Although the evidence in plaintiff's favor may not be

---

[8]    Nuvance briefly argues that the evidence that Drs. Narayan and Jafar threatened plaintiff should be disregarded as inadmissible hearsay.  But Nuvance failed to respond to several of plaintiff's arguments explaining why this evidence is not hearsay.  Accordingly, Nuvance has not adequately demonstrated the threats are hearsay.  In any event, the Court finds that, for the purposes of this motion, the threats are not being offered for their truth, but to show that Dr. Warshofsky and Ms. Stock knew plaintiff reported being threatened with termination by these cardiologists.  See Fed. R. Evid. 801(c)(2).  This ruling is without prejudice to Nuvance making a similar evidentiary objection in a pretrial motion or at trial.

especially strong, a reasonable jury could conclude plaintiff was removed as Chief because Nuvance determined his frequent complaints about cardiologist misconduct during TAVR and ECMO procedures were what made him an ineffective leader of the structural heart team.

Accordingly, Nuvance is not entitled to summary judgment on plaintiff's claims under Sections 740 and 741 of the New York Labor Law.

III.    Breach of Contract Claim

Nuvance contends it is entitled to summary judgment on plaintiff's breach of contract claim because as a matter of law it did not breach the employment agreement.

The Court agrees.

"Under New York law, the elements of a breach of contract claim are [i] the existence of an agreement; [ii] adequate performance of the contract by the plaintiff; [iii] breach of contract by the defendant; and [iv] damages. Swan Media Grp., Inc. v. Staub, 841 F. Supp. 2d 804, 807 (S.D.N.Y. 2012).

Here, plaintiff claims Nuvance breached the employment agreement by (i) suspending him with pay for the final ten months of his contract, and (ii) failing to pay him for call coverage at the appropriate rate.[9]

Plaintiff's first argument relies on Section 7(d) of the employment agreement, titled "Suspension," which reads:

> [Nuvance] reserves the right to suspend Physician from actively providing services for a reasonable time, with compensation, in instances where [Nuvance] reasonably determines that Physician's continued activity puts at risk the health and safety of any patients, fellow employees, or the Physician. Such suspension may be followed by termination of the Employment Period . . . or reinstatement of the Physician to active service.

---

[9]    Plaintiff no longer asserts Nuvance breached the employment agreement by failing to pay certain performance and administrative bonuses. (Doc. #61 at 25 n.4).

14

(Doc. #68–21 at ECF 4–5).

The Court is persuaded by Nuvance's argument that Section 7(d) is of no import because plaintiff was not "suspended" but rather placed on paid administrative leave. (Docs. ##57–1 at ¶ 22; 62 at ¶ 31). Moreover, plaintiff incorrectly reads Section 7(d) to establish that Nuvance could <u>only</u> suspend him when his continued activity posed a risk to the health and safety of patients. (Doc. #61 at 25). The fact that Nuvance "reserve[d] the right" to suspend plaintiff when his activity put the health and safety of patients at risk does not mean that Nuvance was barred from suspending plaintiff in other circumstances. (Doc. #68–21 at ECF 4–5); <u>see also</u> <u>Georgitsi Realty, LLC v. Penn-Star Ins. Co.</u>, 702 F.3d 152, 155 (2d Cir. 2012) (explaining the Court may not "write into a contract conditions the parties did not insert by adding or excising terms under the guise of construction"). Accordingly, Nuvance as a matter of law did not breach Section 7(d) of the employment agreement.

Plaintiff's second argument relies on Section 6(b) of Exhibit A to the employment agreement, which entitled plaintiff to higher hourly rates for call coverage if the number of surgeons dropped below three and Nuvance "fails to make reasonable efforts to recruit or refuses to hire qualified candidates (either employed or through a locums arrangement)." (Doc. #68–21 at ECF 9).

Plaintiff argues Nuvance breached Section 6(b) by failing to pay him increased call coverage rates in 2022. Indeed, the number of surgeons dropped below three after Dr. Neragi was terminated in February 2021. (Doc. #68–2). And plaintiff offers evidence that Nuvance did not make reasonable efforts to hire a replacement because it rejected a suitable candidate whom plaintiff recommended, and ultimately did not hire a permanent replacement until January 2024. (Docs. ##67 at ¶ 35; 68–39 at Tr. 50).

However, Section 6(b) required Nuvance to make reasonable efforts to recruit or hire a qualified candidate "either employed or through a locums arrangement." (Doc. #68–21 at ECF 9) (emphasis added). Here, Nuvance has introduced evidence that it utilized the services of locums surgeons during the relevant time. (Doc. #57–1 at ¶ 32). Because plaintiff cites no record evidence to dispute this fact, the Court finds as a matter of law that Nuvance complied with Section 6(b) of the employment agreement.

Thus, Nuvance is entitled to summary judgment on plaintiff's breach of contract claim.

IV.    Failure to Pay Wages Claim

Nuvance also contends it is entitled to summary judgment on plaintiff's failure to pay wages claim under Section 193 of the New York Labor Law.

The Court agrees.

"Section 193 provides that no employer shall make any deduction from the wages of an employee, except for certain deductions not relevant here." Trahan v. Lazar, 457 F. Supp. 3d 323, 362 (S.D.N.Y. 2020). "Wages are the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis." Id. at 362–63.

Here, plaintiff's failure to pay wages claim is again based on Nuvance's alleged failure to pay increased call coverage rates in 2022. (Doc. #61 at 26). As detailed above, Nuvance has introduced uncontroverted evidence that it utilized the services of locums surgeons during the relevant time period, and thus was not required to pay plaintiff increased coverage call rates. Because plaintiff did not earn the increased call coverage rates, Nuvance did not fail to pay any wages in violation of Section 193.

Thus, Nuvance is entitled to summary judgment on plaintiff's failure to pay wages claim.

16

**CONCLUSION**

The motion for summary judgment is GRANTED IN PART and DENIED IN PART.

Plaintiff's claims for breach of contract and failure to pay wages are resolved in defendant's favor.  Plaintiff's claims for whistleblower retaliation are unresolved and remain pending.

The Clerk is instructed to terminate the motion.  (Doc. #56).

The Court will conduct a case management conference on February 24, 2026, at 11:00 a.m. to be held at the White Plains courthouse, Courtroom 620, at which time counsel shall be prepared to discuss, among other things, the setting of a trial date and a schedule for pretrial submissions, as well as what good faith efforts they have made and will continue to make to settle this case.  To be clear, counsel are directed to discuss settlement in good faith prior to that date.

Dated:  February 3, 2026
    White Plains, NY                        SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge

17